IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,

    v.

MILTON R. NANCE,

    Defendant.

Criminal No. 09-193
**ELECTRONICALLY FILED**

## MEMORANDUM AND ORDER OF COURT

### I.    INTRODUCTION

Defendant Milton Nance is charged in a twelve count indictment with counterfeiting, bank and access device fraud, and identity theft, in violation of 18 U.S.C. §§ 472, 513(a), 1344(1), 1029(a)(2), and 1028A(a)(1), based on conduct allegedly occurring between January 2008 and August 2008.   Before the Court is defendant's Motion to Suppress (Doc. No. 32) incriminating statements he made to Allegheny County detectives at the Westmoreland County Jail on September 17, 2008, on the grounds that defendant's statements were coerced by a promise that he would be prosecuted in state court on state charges if he cooperated with the detectives.   Defendant also moves to suppress physical evidence that was found and seized pursuant to sequential warrants to search his personal belongings, his car, and his motel room on August 19 and 20, 2008.[1]

After careful consideration of the motion to suppress, the parties' proposed findings of fact and conclusions of law, and the transcript of the suppression hearing of

---

[1] Nance initially moved to suppress a February 5, 2008, post-arrest interrogation statement, but abandoned that issue at the suppression hearing on his motion to suppress.   See Transcript, Suppression Hearing (Doc. No. 41) at 92.

April 26, 2010 and May 3, 2010, the Court finds that defendant is a thoroughly unbelievable witness, that the testimony of the interrogating detectives is credible and reasonable, that defendant's statements were made after he had been advised of his *Miranda* rights and that he understood and knowingly waived those rights, that his statements were not coerced by any false promise and were voluntary, and that the affidavits of probable cause accompanying the applications for search warrants set forth ample probable cause to support the issuance of the several warrants and that the searches and seizures of evidence pursuant to said warrants were lawful. The Court will, therefore, deny the motion to suppress.

## II.    FINDINGS OF FACT

### A.    Background

Defendant, Milton Randolph Nance, is a 51 year old adult who earned a Bachelor of Arts degree in Business Administration from the University of Pittsburgh and applied his education to a career of fraud and deceit. Nance has a lengthy criminal record of convictions for fraud and forgery. He was convicted in federal court in November, 1990 of various fraud offenses and again, in a separate case that same year, for credit card fraud. Since 1990, Mr. Nance has been convicted of fraud related offenses in Pennsylvania state court on six different occasions, including for forgery, access device fraud, theft by deception, theft by unlawful taking and receiving stolen property, and identity theft.

On February 5, 2008, Nance was arrested by Jefferson Hills and Pleasant Hills police officers at the Starlight Motel in Pleasant Hills, Pennsylvania, for violating the conditions of his parole and for fraud charges pertaining to counterfeit currency and

forged checks.   Pursuant to a call by Jefferson Hills and Pleasant Hills police officers, on February 5, 2008, Special Agent ("SA") Benjamin Full interviewed Milton Nance regarding Nance's possession of counterfeit money and checks, after advising defendant of his Miranda rights.   Nance understood those rights, and waived his Miranda rights by executing a warning and waiver of rights form before any questions were asked of him.

Full told Nance that investigators like him do not make the ultimate decisions about whether a case will be prosecuted in federal or state court, and that the U.S. Attorneys Office decides whether the case will be prosecuted in federal court.   Nance then provided SA Full with the details of his criminal activities involving counterfeit money and counterfeit checks.   Thereafter, SA Full searched Nance's motel room and found clippings of counterfeit currency, tools used to cut currency, such as a razor blade, and other indicia of counterfeiting.   In April 2008, SA Full learned that the U.S. Attorneys Office had declined to prosecute the case, and that it had been turned over to the Allegheny County Police Department in May 2008.

A few months later, on May 20, 2008, a Dollar Bank investigator called Detective Corrine Orchowski of the Allegheny County Police Department to examine a suspected fraudulent check that Nance had attempted to negotiate.   On May 30, 2008, Orchowski, looking for defendant, contacted defendant's probation officer.   The probation officer told Orchowski that defendant had been mistakenly released from the Allegheny County Jail.

On August 19, 2008, defendant was again suspected of forging checks and counterfeiting currency.   Officers of the White Oak Police Department arrested Nance for Theft by Deception and for attempting to use fraudulent checks at a local hotel.   The White Oak Police Department requested the Pennsylvania State Police Department to

continue the investigation and State Troopers Teko M. Angelicchio and James A. McCutcheon transported Nance to the Westmoreland County Court of Common Pleas to be arraigned.

Two subsequent series of events are at issue in this motion. First, the defendant moves to suppress the collection of physical evidence pursuant to several search warrants after the August arrest; second, defendant moves to suppress incriminating statements he made to two Allegheny County Detectives during an interrogation at the Westmoreland County Jail on September 17, 2008.

### B.     Collection of Physical Evidence

Incident to Nance's August 19 arrest, Nance was subjected to a pat-down search of his personal belongings; he had a large amount of items in his pockets.   Some of his personal items were secured.   A member of the White Oak Police Department provided Troopers McCutcheon and Angelicchio with Nance's personal possessions in a container and told them that White Oak officers had not gone through those items.

Nance was transported together with his belongings to Greensburg, Westmoreland County Pennsylvania, arriving some 35 to 45 minutes later.   Pursuant to State Police standard policies to search incident to arrest and to inventory property in an arrestee's possession, Trooper Angelicchio conducted a warrantless search of Nance's possessions while in the processing room on August 19, 2008 pursuant to *United States v. Edwards*, 415 U.S. 800, 802 (1974) (lawful to conduct searches of personal property of prisoners for evidence and weapons upon arrest and/or after they have been taken into custody).

4

Trooper Angelicchio located counterfeit federal reserve notes, a credit card in the name of Clayton Hoffer, and receipts in the name of Hoffer in Nance's possessions. in plain view, and at that point ceased his examination of the personal belongings to seek a warrant. Thereafter, the State Troopers filed a series of applications for search warrants, supported by affidavits of probable cause, to search defendant's additional personal belongings, motel room, and car. The District Justice reviewed the applications and accompanying affidavits, and subsequently issued search warrants. *See* Applications for Search Warrant, With Affidavit Attached (Docs. No. 36-4, 36-5, 36-6).

The first Affidavit of Probable Cause for a warrant to search defendant's personal items stated:

> On 08/19/2008 The White Oak Police Department arrested Milton Randolph Nance based upon an arrest warrant issued by District Magistrate James Falcon for Forgery, Criminal attempt/Theft by Deception and Criminal Attempt/Bad Checks. Nance is a B/N-M date of birth 07/13/1958 with no permanent address. Tpr. James McCutcheon and I responded to White Oak Police Department and picked up Nance in order to transport him back to Westmoreland County to be arraigned on the charges. All of the possessions removed from Nance's pockets were given to me by White Oak officers. Nance was transported to P.S.P. Greensburg without incident. When I was searching through Nance's belongings for contraband prior to transporting him to the Westmoreland County Prison, a credit card with the name of Clayton Hoffer was observed. I unfolded a large group of papers looking for contraband and I observed a receipt for a stay at a hotel in the name of Clayton Hoffer. As I counted U.S. Currency with his possessions, I observed a 20 dollar bill and a 50 dollar bill that appeared to be fraudulent. A Universal Counterfeit Detector Marker was used on the bills and a positive reaction indicated that the bills were counterfeit. When Nance was processed, N.C.I.C. hits occurred indicating that Nance was wanted by Greensburg City Police Department for Forgery, Criminal Use of Com Facility and unlawful; Use of Computer. There was also a warrant for Nance for a parole violation. Also observed among Nance's Possession were two cellular telephones, a computer thumb drive, and a wireless internet card.
> I am requesting a search warrant to search the personal possessions of Milton Randolph Nance to determine if there is any further contraband

relating to the crimes of Forgery, Fraud or Theft.

Application for First Search Warrant, Affidavit (Doc. No. 36-4).

Executing this warrant, the troopers found receipts for an ink jet printer and two computers, which prompted a second application for a search warrant for Nance's motel room in Irwin Township, Pennsylvania, supported by an Affidavit of Probable Cause repeating the averments of the first affidavit and adding the following:

> On 08/19/08, a search warrant was obtained to search the personal possession of Milton Randolph Nance to determine if there was any further contraband relating to the crimes of Forgery, Fraud or Theft.   As a result of the search warrant, receipts were observed with Nance's possessions indicating that Nance recently purchased a Compaq computer, a laser jet printer, and a Acer 3000 computer.   Nance also had in his possession room keys for a Marriott hotel room.   During the course of Nance's arraignment before MDJ Mahady, Nance indicated that he was staying at the Motel 3, located in Irwin.
> I am requesting a search warrant to search the motel 3 room # 25, located at 7578 route 30, Irwin, Hempfield Twp., Westmoreland County, which is currently rented to Milton R. Nance to search for further contraband relating to the crimes of Forgery, Fraud or Theft.

Application for Second Search Warrant, Affidavit (Doc. No. 36-5).

Executing the search warrant, the troopers found in the motel room a computer system that apparently was used to develop counterfeit currency, an empty computer box, a copier, and a scanner which had United States Currency on it.   Thereafter, the troopers requested a third search warrant to search Nance's rented car.   The Affidavit of Probable Cause repeated the averments of the previous affidavits, and added the following:

>  On 8/20/08 a search warrant was obtained for room #25 at Motel 3 in Irwin, PA where Nance had been staying.   As a result of the search, counterfeit money was discovered as well as computer equipment to produce counterfeit money.   A box for a Compaq lap top computer was found in the room but no computer was discovered.   Among Nance's possessions

searched on 08/19/08 a receipt was discovered showing that Nance had
recently purchased a Compaq computer and a copier.   The copier was
discovered in the room with U.S. Currency on the scanner.
I am requesting a search warrant to search the Red Kia Rio Rented by
Milton Randolph Nance to determine if there is any further contraband
relating to the crimes of Forgery, Fraud or Theft.

Application for Third Search Warrant, Affidavit (Doc. No. 36-6).

The District Justice issued the third warrant and the troopers found additional

contraband in the car.

### C.      The Incriminating Interrogation

On September 17, 2008, Detective Orchowski and Detective Lane Zabelski of the

Allegheny County Police Department interviewed Nance at the Westmoreland County

Jail regarding Nance's alleged criminal activities.   Upon entering an interrogation room

at the Westmoreland County Jail, Orchowski introduced herself and Zabelski to Nance.

She explained why she was there and addressed Nance's concerns regarding the

interview taking up his lunch time.

Orchowski stated the *Miranda* warning before she formally began questioning

Nance.   Nance signed a waiver stating that he understood his rights and wished to speak

with the detectives.   Nance was not physically restrained during the interview which

lasted approximately an hour and a half.   During the interview, Orchowski told Nance

that she would charge and prosecute him at the state level if he cooperated.   Detective

Orchowski testified in relevant part as follows:

BY AUSA

Q. How did you begin the conversation with Mr. Nance?
A. I introduced myself and Detective Zabelski as detectives with the
Allegheny County Police.

7

Q. What did you tell him about what you were investigating?
A. I had asked him if he remembered being interviewed by the Secret Service, to which he acknowledged yes, and told him that the Secret Service had turned over the investigation to the Allegheny County Police.

Q. What did he say in regard to that?
A. He acknowledged the fact that we were there, and he had stated that he was glad that the county was going to take over the investigation because he had done federal time and he knew that if he was prosecuted at the state level, that he would get less time than if the feds took the case.

Q. So let me understand. He said that or you said that?
A. He said that.

Q. Did you express any agreement, disagreement with that?
A. No.

Q. You didn't talk about that at all?
A. No. He just made a statement.

Q. What did you say in response to him making that statement?
A. I didn't agree nor disagree with that statement.

Q. What was said next by you?
A. I told him that if he would cooperate with me, that I would charge him at the state level.

Transcript (Doc. No. 41) at 79-80.

Orchowski was uncertain when she gave Nance the *Miranda* warning. Nance claims Orchowski stated the warning only after she promised to bring charges at the state level, and that he relied on that promise; Detective Zebelski, however, contradicted Nance as follows:

BY AUSA

Q. Can you tell us how the conversation with Mr. Nance began?
A [Zebelski]. Introduction, Detective Orchowski introduced myself and her as county police detectives and that's how the interview started.

Q. What happened next?
A. Miranda, Miranda warnings, just pretty much standard. There might have

8

been some small talk. I think, I believe the defendant commented about because of the time of day we arrived, there was a possibility he was going to miss lunch. Detective Orchowski asked if he wanted us to come back after lunch and he said that was fine.

Q. Was that the only thing that was discussed prior to Miranda warnings?
A. Yes.

Q. Can you tell us how Miranda warnings were administered to Mr. Nance?
A. We have a standardized form that Mr. Nance was read. He acknowledged that he did understand his rights. It was signed and witnessed by myself and Detective Orchowski.

                    *       *       *

Q. Now, I want to ask you some specific questions so that we're certain. Prior to Mr. Nance being administered and waiving his Miranda rights, had there been any discussion by you or Detective Orchowski in regard to whether the Secret Service had interviewed Nance?
A. No. That was brought up after Miranda.

Q. Prior to the administration and waiver of Miranda rights, had Detective Orchowski questioned Mr. Nance about the offenses?
A. No.

Q. Prior to the administration and waiver of Miranda rights, had there been any discussion about Mr. Nance being prosecuted by federal authorities?
A. No.

Q. Prior to administration or waiver of Miranda rights, had there been any discussion about him cooperating with Detective Orchowski and she would see that the matter would stay in state court?
A. No.

Q. And prior to the administration of Miranda warnings, had Mr. Nance said anything about thinking he'd get more time in federal court?
A. No.

Q. Can you describe for us what happened after Miranda rights were administered and waived.
A. Detective Orchowski addressed the reason she was there or we were there, and it was a very cordial and polite interview.   Mr. Nance described the actions involving the crimes and pretty much put it all on the table for her. Very polite interview.

Q. Now, after the waiver of Miranda rights, what did she say to him in terms of describing while you were there --
A. She explained that she would have -- she was able to charge for multiple incidents within Allegheny County and that she would probably be more likely than not consolidating all the cases and she would be charging on the state level.

Q. Did she ask him about or mention anything about a prior U.S. Secret Service interview?
A. There was mention of that. I don't recall specifically who brought it up, but Mr. Nance did state that the Secret Service did interview him previous to our arrival.

Q. What else did Detective Orchowski say about the prior Secret Service involvement?
A. What I recall is she explained that because the Secret Service wasn't going to handle the case, that she was going to be filing the charges on the state level.

Q. What did Mr. Nance say, if anything, in regard to his views about federal versus state?
A. Mr. Nance was aware that the penalties were more severe on a federal level versus a state level.

Q. And that's what he said?
A. Yes.

Q. Did Detective Orchowski at any point after Miranda make any promises about where the prosecution would take place?
A. No.

Transcript (Doc. No. 42) at 4-5.

Nance's testimony to the contrary is as follows:

BY DEFENSE COUNSEL

Q. Did that part of the conversation occur before she reviewed with you your Miranda rights?

A. [Defendant] Definitely happened before she reviewed my Miranda rights.

Q. Was that the reason that you did continue to cooperate with her and agree to waive your rights?
A. That was the only reason because she surprised me because I didn't

know she was coming and I was there already for Trooper McCutcheon, the state police case. So she said, I have good news for you. I'm saying to myself, what possible good news could she have? Well, you cooperated so well with Agent Full, we're going to take your case over, and if you cooperate with us, I won't go federally, like she said, but it definitely occurred prior to any Mirandizing.

\*       \*       \*

BY AUSA

Q. And you know as you sat there that you have a nice long record and that you were facing a lot of imprisonment time, whether or not you were in state or federal court?

A. Well, I didn't know that. I just knew that I would probably have a better chance in the state court than with federal court because I had already been in the federal system, so I just assumed that it would be fortunate for me to have it in state court.

Q. That was your statement, it wasn't Detective Orchowski's?
A. That's what I told her in response to her saying she promised to keep it in state court. That was my statement, correct. That's what I -- that's was my communication to her, how I interpreted what it meant to me -- for me to go ahead on with that conversation.

Q. Your interpretation?
A. Exactly, that's my interpretation and that was what my response was.

Q. So she didn't promise you any leniency in state court?
A. She promised me that it would stay in state court, and that was the promise that I was basing my cooperation on.

Transcript (Doc. No. 41) at 93.

Nance cooperated with the law enforcement agents and made incriminating statements.   Nance moves to suppress his statements made on September 17, 2008, claiming that his statements were coerced by false promises, and therefore, were involuntary.   He contends that Orchowski's promise, that she would charge Nance at the state level, was a false promise that induced his cooperation and that such deceit vitiates the voluntariness of his statements

## III.    DISCUSSION

### A.    Law Enforcement Agents Lawfully Seized Physical Evidence

The Fourth Amendment of the United States Constitution guarantees the government may not search or seize an individual's property without a warrant based on probable cause.   U.S. Const. Amend. IV.   District courts reviewing the issuance of a search warrant must not make an independent probable cause determination but, rather, are "constrained to determine only whether the affidavit provided a sufficient basis for the decision the magistrate judge actually made."   *United States v. Jones*, 994 F.2d 1051, 1057 (3d Cir. 1993).   The issuing authority's determination of probable cause should be affirmed if, after considering the totality of the circumstances, "there is a substantial basis for a fair probability that evidence will be found."   *United States v. Conley*, 4 F.3d. 1200, 1205 (3d. Cir. 1993).

Moreover, "the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants."   *United States v. Ventresca*, 380 U.S. 102, 109 (1965).   Direct evidence linking the crime to the place to be searched is not necessary when issuing a warrant, "[i]nstead, probable cause can be, and often is, inferred by 'considering the type of crime, the nature of the items sought, the suspect's opportunity for concealment and normal inferences about where a criminal might hide stolen property." *Jones*, 994 F.2d at 1056 (citations omitted).

It is appropriate for a reviewing court to consider in the alternative, or even to turn immediately to a consideration of the officers' good faith in executing a warrant issued by a neutral and detached magistrate.   *United States v. Leon*, 468 U.S. 897, 925 (1984);

*United States v. $92,422.57 in U.S. Currency*, 307 F.3d 137, 146 (3d Cir. 2002). The fact that an officer executes a search pursuant to a warrant typically "suffices to prove that an officer conducted a search in good faith and justifies application of the good faith exception." *United States v. Hodge*, 246 F.3d 301, 308 (3d Cir. 2001) (citing Leon, 468 U.S. at 922. Under Leon, suppression of evidence "is inappropriate when an officer executes a search in objectively reasonable reliance on a warrant's authority." *United States v. Williams*, 3 F.3d 69, 74 (3d Cir. 1993).

The Supreme Court developed the exclusionary rule to deter unlawful police conduct. *Leon*, 468 U.S. at 906. However, where law enforcement officers act in the "objectively reasonable belief that their conduct d[oes] not violate the Fourth Amendment," "the marginal or nonexistent [deterrent] benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion." *Id.* at 918, 922. Therefore, if an officer has obtained a warrant and executed it in good faith, "there is no police illegality and thus nothing to deter." *Id.* at 921.

Defendant argues that the probable cause determination by the District Justice was unwarranted because there was no substantial basis to find a fair probability that evidence of a crime would be found at the places to be searched. Specifically, the defendant directs the Court's attention to some of the characteristics of these applications; first, the third application was vague when it never described what the items in the car would be but wrote that items were in "plain view." Furthermore, defendant alleges that the discovery of counterfeit currency and computer equipment in defendant's personal belongings did not increase the likelihood of finding contraband or evidence of a

14

crime in the defendant's motel room or his car.   In short, the applications and the affidavits in support were inadequate to provide a reasonable nexus between the items sought and the places to be searched.

The Court disagrees.   The circumstantial evidence cited in the affidavits provided a substantial basis for the issuing authority's decision that a sufficient nexus to issue these warrants existed between the crimes, the items sought, the motel room, and the Kia Rio. The affidavits contained sufficient common facts to support the inference that Nance had been forging or making counterfeit money and that he was transient, and therefore the items sought might be found in his motel room and car.

Nance was found in possession of 2 counterfeit notes. The thumb drive and wireless internet card in his possessions indicated that he had an instrument which could be used for counterfeiting money and other financial documents, namely a computer and printer. Nance was in possession of a credit card in another person's name and appeared to have used it to obtain lodging. A magistrate could reasonably conclude that Nance was making counterfeit money, since he was a person who could not legitimately pay for lodging and needed credit card fraud and identity theft to support himself.

The affidavits averred two separate outstanding warrants for forgery and fraud offenses. The use of prior arrests and convictions to aid in establishing probable cause is not only permissible but is especially helpful where, as in this case, the previous arrest or conviction involves forgery, a crime of the same general nature as the one which the warrant is seeking to uncover.   This information supports the conclusion that Nance is a forger and could be engaged in the forgery of counterfeit money and other financial documents.

15

The nature of the offenses under investigation and the items to be seized support the inference that evidence could be found in the locations where Nance was residing and in his car. Nance's personal possession of another's credit card and possession of counterfeit money supports that inference that he may have secreted his means of making counterfeit money and financial documents where he resided or in his car. It was also reasonable for the issuing authorities to believe that Nance may have more counterfeit money or identity and credit card fraud records where he resided or in his car.

The determination of the magistrate that there was probable cause set forth in each of the affidavits is fully supported by substantial evidence, and the searches and seizures pursuant thereto were lawful. Moroever, the record shows that the troopers' reliance on the search warrants issued by the magistrate was reasonable and that the warrants were executed in good faith reliance under *Leon*.

For the foregoing reasons, the Court will deny the motion to suppress the physical evidence.

**B.     Nance's Statements Were Voluntary and the Product of His Free Will**

The Fifth Amendment of the United States Constitution guarantees that, in a criminal proceeding, no person will be forced to be a witness against himself. U.S. Const. Amend. V. Statements made by an accused must be voluntary and not based on any false promises by the government that coerce incriminating statements. *Bram v. United States*, 168 U.S. 532, 542-43 (1897).

The United States Supreme Court created the Miranda warnings for law enforcement to follow prior to custodial interrogation of a suspect. *Miranda v. Arizona*, 384 U.S. 436 (1966). Specifically, before any custodial questioning, the suspect must be

informed that "he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.* at 445. These "warnings are constitutionally required to combat the compelling pressures inherent in custodial police interrogation and to permit a full opportunity to exercise the privilege against self-incrimination" guaranteed by the Fifth Amendment. *Dickerson v. United States*, 530 U.S. 428, 440 (2000). Statements obtained in violation of Miranda, even though they may be voluntary, are inadmissible to prove guilt at trial. See *Michigan v. Mosely*, 423 U.S. 96, 100 (1975); *Miranda*, 384 U.S. at 458-59.

On a colorable motion to suppress statements as involuntary, the government must bear the burden of proving, by a preponderance of the evidence, that a defendant was properly advised of his Miranda rights; that the defendant voluntarily, knowingly, and intelligently waived said rights; and that the ensuing statement was voluntary. *Colorado v. Connelly*, 479 U.S. 157, 169 (1986). "A defendant may waive his Miranda rights if the waiver is made knowingly, intelligently, and voluntarily." *United States v. Pruden*, 398 F.3d 241, 246 (3d Cir. 2005). To determine that a waiver was voluntary, knowing and intelligent, two factors must be shown: First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. *Moran v. Burbine*, 475 U.S. 412, 421 (1986).

"The voluntariness of a waiver of [the Fifth Amendment] privilege has always depended on the absence of police overreaching, not on 'free choice' in any broader

sense of the word." *Connelly*, 479 U.S. at 170 (reasoning that the Fifth Amendment is solely concerned with protection from governmental coercion). Either physical or psychological coercion by law enforcement may render a Miranda waiver involuntary. *Miller v. Fenton*, 796 F.2d 598, 604 (3d Cir. 1986). In this regard, a promise by a law enforcement officer may qualify as coercion. *United States v. Walton*, 10 F.3d 1024, 1030 (3d Cir. 1993); *United States v. Conley*, 859 F.Supp. 830, 836 (W.D.Pa. 1994) (collecting cases). Similarly, police words or deeds that are likely to cause a suspect to believe he will suffer serious adverse consequences if he does not cooperate, or will receive substantial leniency if he does, can render a confession involuntary. See *Walton*, 10 F.3d at 1029-30 (agent's promise that defendant could speak "off the cuff" would be understood by a suspect to mean that defendant's statements would not be used against him, rendering confession involuntary); *United States v. Veilleux*, 846 F.Supp. 149, 154-55 (D.N.H. 1994) (confession held involuntary when defendant was told that nothing he said would be used against him); *United States v. Kontny*, 238 F.3d 815, 818 (7th Cir. 2001) (investigator's promise that a suspect would not be prosecuted if he played ball could be the kind of false promise that would overcome the suspect's free will).

To determine the sufficiency of Miranda warnings and any waiver of rights, the Court examines the totality of the circumstances surrounding the questioning. See *United States v. Velasquez*, 885 F.2d 1076, 1086 (3d Cir. 1989); *Arizona v. Fulminante*, 499 U.S. 279 (1991). In analyzing the totality of the circumstances, a court "must look at the facts of the particular case, including the background, experiences, and conduct of the suspect." *Id.* at 1086. Potential circumstances affecting the voluntariness of the statements include: 1) evidence of police coercion; 2) the length and location of the

interrogation; 3) the defendant's maturity, physical condition, mental health and level of education; 4) whether Miranda warnings were given; and 5) whether an attorney was present for the interview. See *United States v. Swint*, 15 F.3d 286, 289 (3d Cir. 1994).   A statement may be the product of police overreaching even after a defendant has been advised of and validly waived his Miranda rights. See *Dickerson*, 530 U.S. at 444 (acknowledging that the administration of Miranda warnings does not dispense with the requirement that a statement be made voluntarily). However, "cases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of Miranda are rare."   *Berkemer v. McCarty*, 468 U.S. 420, 433 n. 20 (1984); *Dickerson*, 530 U.S. at 444 ("The requirement that Miranda warnings be given does not, of course, dispense with the voluntariness inquiry.").   An express written statement of a waiver is strong proof as to the validity of a waiver, of course, but a waiver may also be made orally or implied from a defendant's conduct.   *North Carolina v. Butler*, 441 U.S. 369, 373 (1979).

A statement is involuntary when the suspect's "will was overborne in such a way as to render his    confession the product of coercion."   *Fulminante*, 499 U.S. at 288. Where a defendant challenges the voluntariness of a statement under the Due Process Clause of the Fifth Amendment, "the prosecution must prove at least by a preponderance of the evidence that the confession was voluntary." *Lego v. Twomey*, 404 U.S. 477, 489 (1972); see also United States v. Jacobs, 431 F.3d 99, 108 (3d Cir. 2005).

To the extent Nance's recollection and testimony differs from that of Detective Orchowski on the scope of any "promise" and Detective Zbelski's testimony on that issue and on the timing of the Miranda warnings, the Court finds Nance's credibility nil in light of

19

his career of deception and fraud, and conversely, finds the testimony of the detectives to be objectively reasonable and quite believable.   After considering the totality of the circumstances, this Court finds that Nance's confession was voluntary and Orchowski's "promise" to file charges and prosecute him in state court did not overpower his will or coerce incriminating statements.   Orchowski did in fact charge Nance in state court, and preliminary hearings were held in state court, evidencing that Orchowski was not attempting to deceive and get information out of Nance, but had a sincere belief that the case would go to state court.

Moreover, as Nance must have known, the decision to prosecute in state of federal court was not Detective Orchowski's to make but was a management decision made by her superior state officers in conjunction with federal authorities.   Nance is an educated, intelligent man having much experience with state and federal criminal prosecutions, and he was aware from the outset that the federal government had an interest in prosecuting him.   The Court simply does not find credible defendant's statement that he cooperated with Allegheny County Detectives only because of their assurances that he would not face federal prosecution.   Any such belief would be objectively unreasonable.   The totality of the circumstances demonstrate convincingly that Nance's will was not overborne by Orchowski's statements that she would prosecute him in state court.   This Court will therefore deny the motion to suppress Nance's statements.

### III. CONCLUSION

Accordingly, for the foregoing reasons, IT IS HEREBY ORDERED that defendant's Motion to Suppress evidence (Doc. No. 32) is DENIED.


**SO ORDERED**
s/Arthur J. Schwab
Arthur J. Schwab
United States District Judge


cc:    All ECF registered counsel